UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK



PETER WELLS, 07-A-0650,

        Plaintiff,

    v.

JEFF McKOY, MARK BRADT,
JAMES THOMPSON, LEANNE
LATONA, and NOI CHAPLAIN
JAMES CONNER,

        Defendants.

**DECISION AND ORDER**

1:16-CV-00113 EAW

## INTRODUCTION

*Pro se* plaintiff Peter Wells ("Plaintiff"), a prisoner currently incarcerated at the Coxsackie Correctional Facility, brings this action asserting claims under 42 U.S.C. § 1983 and the Religious Land Use and Institutionalized Persons Act of 2000 ("RLUIPA"), 42 U.S.C. § 2000cc *et seq.* Plaintiff, a former follower of the Nation of Islam ("NOI"), alleges that defendants Jeff McKoy ("McKoy"), Mark Bradt ("Bradt"), James Thompson ("Thompson"), Leanna Latona ("Latona"), and James Conner ("Conner") (collectively "Defendants") interfered with his ability to attend the Saviors' Day[1] event on March 1, 2013, while he was housed at the Attica Correctional Facility ("Attica"). (Dkt. 1). Specifically, Plaintiff challenges a policy implemented by the New York State Department

---

[1]    Saviors' Day is an NOI holiday commemorating the birth of its founder, Wallace Fard Muhammad.

of Corrections and Community Supervision ("DOCCS") regarding specially prepared meals for religious holidays. (*Id.* at 1-2).

Presently before the Court is Defendants' motion for summary judgment (Dkt. 22). For the reasons set forth below, Defendants' motion is granted.

## BACKGROUND

The following facts are drawn from Defendants' Rule 56 Statement of Undisputed Facts (Dkt. 22-1) ("Defendants' Statement"), Plaintiff's Statement of Disputed Facts (Dkt. 25 at 20-33) ("Plaintiff's Statement"), and their supporting documents. All facts are construed in the light most favorable to Plaintiff as is required when a defendant moves for summary judgment.

Plaintiff began residing at Attica on June 27, 2011. (Dkt. 22-3 at 19). At all relevant times, McKoy was the Deputy Commissioner for Program Services at DOCCS' Central Office. (Dkt. 22-1 at ¶ 2). During the Plaintiff's incarceration at Attica, Bradt was the Superintendent, Thompson was the Deputy Superintendent of Program Services, Latona was the Assistant Deputy Superintendent of Program Services, and Conner was the NOI Chaplain. (*Id.* at ¶ 3).

While housed at Attica, Plaintiff self-designated his religion as NOI. (*Id.* at ¶ 5; Dkt. 25 at 22). NOI followers adhere to special dietary restrictions for certain religious holidays. (*See* Dkt. 22-1 at ¶ 16; Dkt. 22-3 at ¶¶ 14-15).

DOCCS provides an alternative inmate diet system, called the cold alternative diet ("CAD") program, designed to accommodate certain religious dietary restrictions,

including those of NOI followers. (Dkt. 22-1 at ¶¶ 8, 16). The CAD program costs more than twice the amount of a standard inmate diet. (*Id.* at ¶ 9).

McKoy delegates certain responsibilities for religious programming to DOCCS' Office of Ministerial, Family and Volunteer Services ("MFVS"). (Dkt. 22-1 at ¶ 11). On January 11, 2013, the director of MFVS issued a memorandum directing New York State prison facilities to require inmates to complete a CAD meal consent form ("CAD form"). (*Id.* at ¶ 12). Under the policy, inmates first had to sign the CAD form to get approval for receiving religious meals. (Dkt. 22-3 at ¶ 15). They would then separately sign up by a specific deadline for each religious event where they planned to consume a CAD meal. (*Id.* at 13). If an inmate signed up for a CAD meal and then voluntarily did not consume it, the inmate could potentially face disciplinary sanctions. (Dkt. 22-1 at ¶ 13). These sanctions would not apply if the inmate missed the meal for an "acceptable" reason such as admission to the infirmary, medical keeplock/confinement, disciplinary confinement, admission to the Special Housing Unit, a court trip, or draft status. (*Id.* at ¶ 14). All of the above information was included on the CAD form. (Dkt. 22-3 at 15).

Plaintiff was provided with the CAD form by mail and in person by Conner. (Dkt. 22-1 at ¶ 16). On February 26, 2013, Latona, who implemented the CAD form policy at Attica, attended an NOI gathering at the prison. (*Id.* at ¶ 17). She went to try and alleviate concerns raised by inmates about potentially facing discipline if they signed up for a CAD meal for the NOI holiday Saviors' Day. (*Id.*). Latona verbally communicated to the inmates at the NOI gathering that Attica did not intend to discipline them with respect to the new CAD form policy if they signed the form for the Saviors' Day feast. (*Id.* at ¶ 38;

- 3 -

Dkt. 25 at 26-27). Plaintiff requested that Latona provide him with a written copy of that promise, which she refused to do. (Dkt. 25 at 26-27).

Plaintiff refused to sign the CAD form and did not register for the Saviors' Day meal, nor did he attend the Saviors' Day service. (Dkt. 22-1 at ¶ 18; Dkt. 25 at 27).

On May 28, 2013, McKoy rescinded the CAD form procedure because it "caused some concern among staff and the [prisoner] population." (Dkt. 22-3 at 17). McKoy asserts that DOCCS does not intend to reinstitute the CAD form policy or anything similar for special religious holiday feasts. (*Id.* at ¶ 45). Plaintiff was transferred from Attica on November 1, 2013. (Dkt. 22-3 at 19; Dkt. 25 at 21). On October 22, 2015, Plaintiff changed his designated religion to the Nation of Gods and Earth ("NOGE"). (Dkt. 22-1 at ¶ 6; Dkt. 25 at 22).

Plaintiff filed the instant action on February 8, 2016 (Dkt. 1). On August 26, 2016, the Court granted Plaintiff leave to proceed *in forma pauperis* and allowed his RLUIPA claim for injunctive relief and his free exercise claim under 42 U.S.C. § 1983 to proceed. (Dkt. 5 at 2-3).[2] Defendants answered the complaint on December 6, 2016 (Dkt. 11), and discovery in this matter closed on July 28, 2017 (Dkt. 13 at 3). On September 28, 2017,

---

[2]    In their motion for summary judgment, Defendants address numerous other claims alleged by Plaintiff in his complaint. (Dkt. 22-2 at 2-4, 9; *see* Dkt. 1). However, the Court already dismissed these claims in its August 26, 2016 Order pursuant to its authority under 28 U.S.C. § 1915, and allowed only Plaintiff's RLUIPA and free exercise claims to proceed. (Dkt. 5 at 2-3); *see Abbas v. Dixon*, 480 F.3d 636, 639 (2d Cir. 2007) (discussing how 28 U.S.C. § 1915 "provide[s] an efficient means by which a court can screen for and dismiss legally insufficient claims" for prisoners proceeding *in forma pauperis* who bring claims against government officials). Therefore, in this Decision and Order, the Court only addresses Defendants' motion as it pertains to the RLUIPA and free exercise claims.

Defendants filed a motion for summary judgment. (Dkt. 22). Plaintiff filed a response to Defendants' motion on October 26, 2017. (Dkt. 25).

## DISCUSSION

### I.    Standard of Review

Rule 56 of the Federal Rules of Civil Procedure provides that summary judgment should be granted if the moving party establishes "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The Court should grant summary judgment if, after considering the evidence in the light most favorable to the nonmoving party, the court finds that no rational jury could find in favor of that party. *Scott v. Harris*, 550 U.S. 372, 380 (2007) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986)).

"The moving party bears the burden of showing the absence of a genuine dispute as to any material fact. . . ." *Crawford v. Franklin Credit Mgmt. Corp.*, 758 F.3d 473, 486 (2d Cir. 2014). "Where the non-moving party will bear the burden of proof at trial, the party moving for summary judgment may meet its burden by showing the evidentiary materials of record, if reduced to admissible evidence, would be insufficient to carry the non-movant's burden of proof at trial." *Johnson v. Xerox Corp.*, 838 F. Supp. 2d 99, 103 (W.D.N.Y. 2011) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986)). Once the moving party has met its burden, the opposing party "must do more than simply show that there is some metaphysical doubt as to the material facts, and may not rely on conclusory allegations or unsubstantiated speculation." *Robinson v. Concentra Health Servs., Inc.*, 781 F.3d 42, 44 (2d Cir. 2015) (quoting *Brown v. Eli Lilly & Co.*, 654 F.3d 347, 358 (2d

Cir. 2011)). Specifically, the non-moving party "must come forward with specific evidence demonstrating the existence of a genuine dispute of material fact." *Brown*, 654 F.3d at 358. Indeed, "the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986).

In addition, "[i]t is well-settled that *pro se* litigants generally are entitled to a liberal construction of their pleadings, which should be read to raise the strongest arguments that they suggest." *Green v. United States*, 260 F.3d 78, 83 (2d Cir. 2001) (quotations and citation omitted); *see also Hemphill v. New York*, 380 F.3d 680, 687 (2d Cir. 2004) ("It is well-established that 'when [a] plaintiff proceeds *pro se* . . . a court is obliged to construe his pleadings liberally, particularly when they allege civil rights violations.'" (alteration in original) (citation omitted)). Moreover, "a *pro se* litigant should be afforded every reasonable opportunity to demonstrate that he has a valid claim." *Satchell v. Dilworth*, 745 F.2d 781, 785 (2d Cir. 1984).

## II.   Plaintiff's RLUIPA Claims

"Section 3 of RLUIPA provides that '[n]o government shall impose a substantial burden on the religious exercise [of an institutionalized person],' 42 U.S.C. § 2000cc–1(a), 'in a program or activity that receives Federal financial assistance,' *id.* § 2000cc–1(b)(1), or in a way that affects or would affect 'commerce with foreign nations, among the several States, or with Indian tribes,' *id.* § 2000cc–1(b)(2)." *Washington v. Gonyea*, 731 F.3d 143, 145 (2d Cir. 2013) (alterations in original). While "RLUIPA does not authorize claims for

- 6 -

monetary damages against state officers," an institutionalized person may bring a claim for injunctive relief under RLUIPA. *Holland v. Goord*, 758 F.3d 215, 224 (2d Cir. 2014).

Defendants move for summary judgment as to Plaintiff's RLUIPA claim for injunctive relief. (Dkt. 22-2 at 6-9). For the reasons that follow, the Court finds that Plaintiff lacks standing to bring a RLUIPA claim for injunctive relief, and accordingly grants Defendants' motion.[3]

To establish standing under Article III of the United States Constitution, "a plaintiff must, generally speaking, demonstrate that he has suffered 'injury in fact,' that the injury is 'fairly traceable' to the actions of the defendant, and that the injury will likely be redressed by a favorable decision." *Bennett v. Spear*, 520 U.S. 154, 162 (1997) (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560-61 (1992)). The injury must be "(a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical." *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 180 (2000). A plaintiff must have standing as to every claim for relief alleged, including requests for injunctive

---

[3]     Defendants argue the RLUIPA claim should be declared moot. However, because all the factual circumstances that Defendants assert moot the claim occurred before the filing of the lawsuit, the applicable doctrine here is that of standing, not mootness. "Mootness has been described as the doctrine of standing set in a time frame: The requisite personal interest that must exist at the commencement of the litigation (standing) must continue throughout its existence (mootness)." *Arizonans for Official English v. Arizona*, 520 U.S. 43, 68 n.22 (1997) (quotation and citation omitted). "Standing doctrine evaluates a litigant's personal stake as of the outset of litigation. Mootness doctrine determines what to do if an intervening circumstance deprives the plaintiff of a personal stake in the outcome of the lawsuit, at any point during litigation after its initiation." *Klein on behalf of Qlik Tech., Inc. v. Qlik Tech., Inc.*, 906 F.3d 215, 221 (2d Cir. 2018) (quotations and alterations omitted) (citing *Altman v. Bedford Cent. Sch. Dist.*, 245 F.3d 49, 70 (2d Cir. 2001)).

relief. *City of Los Angeles v. Lyons*, 461 U.S. 95, 105 (1983). As the Second Circuit has explained:

> In order to meet the constitutional minimum of standing to seek injunctive relief, [a plaintiff] must carry the burden of establishing that he has sustained or is immediately in danger of sustaining some direct injury as the result of the challenged official conduct. In doing this, he cannot rely on past injury to satisfy the injury requirement but must show a likelihood that he . . . will be injured in the future.

*Shain v. Ellison*, 356 F.3d 211, 215 (2d Cir. 2004) (quotations and citations omitted); *see Laidlaw*, 528 U.S. at 191 ("[I]f a plaintiff lacks standing at the time the action commences, the fact that the dispute is capable of repetition yet evading review will not entitle the complainant to a federal judicial forum."); *Nicosia v. Amazon.com, Inc.*, 834 F.3d 220, 239 (2d Cir. 2016) ("Although past injuries may provide a basis for standing to seek money damages, they do not confer standing to seek injunctive relief unless the plaintiff can demonstrate that she is likely to be harmed again in the future in a similar way.").

A plaintiff challenging an official policy "must demonstrate *both* a likelihood of future harm *and* the existence of an official policy or its equivalent" when requesting prospective injunctive relief. *Shain*, 356 F.3d at 216. RLUIPA's statutory provisions reflect this Article III standing requirement. *See* 42 U.S.C. § 2000cc-3(e) ("A government may avoid the preemptive force of any provision of this chapter by changing the policy or practice that results in a substantial burden on religious exercise."); *see also Williams v. Annucci*, 895 F.3d 180, 187 (2d Cir. 2018) ("RLUIPA encourages institutions to accommodate inmate requests by exempting from liability institutions that change challenged policies. . . .").

The Court concludes that Plaintiff lacks standing for his RLUIPA claim in this case because he has not demonstrated a likelihood of future harm. While the official policy at issue undisputedly existed, it was rescinded by the time the lawsuit commenced. Specifically, the undisputed facts show that McKoy repealed the CAD form procedure policy just months after it was implemented, and that it has not been used since May 28, 2013. (Dkt. 22-1 at ¶¶ 12, 33). McKoy has also stated that DOCCS does not intend to reinstitute the CAD form policy or anything similar for special religious holiday feasts. (Dkt. 22-3 at ¶ 45). *See Davis v. Conn. Dep't of Corr.*, 169 F. Supp. 3d 311, 317 (D. Conn. 2016) (holding the plaintiff did not have standing because the policy of requiring a physical fitness test had been eliminated from the correction officer job selection process before the plaintiff brought her lawsuit and it was "not apparent how [the plaintiff's] alleged injury would be redressed by a decision in her favor"); *Clarry v. United States*, 85 F.3d 1041, 1049 (2d Cir. 1996) (holding the plaintiffs lacked standing to seek injunctive relief because the challenged policy was repealed before they asserted the claim). Moreover, Plaintiff no longer followed NOI or the dietary restrictions that come with it when he filed the instant lawsuit.[4] (Dkt. 1; Dkt. 22 at 7). A reasonable trier of fact could only find that Plaintiff has

---

[4]     In addition to the reasons described above, which the Court finds are more than adequate to demonstrate a lack of standing as to all Defendants, Plaintiff lacks standing to assert a RLUIPA claim against Bradt, Thompson, Latona, and Conner because he was transferred from Attica on November 1, 2013. (Dkt. 22-3 at 19; Dkt. 25 at 21); *see Shepherd v. Goord*, 662 F.3d 603, 610 (2d Cir. 2011) ("[A]n inmate's transfer from a prison facility generally moots claims for declaratory and injunctive relief against officials of that facility."); *Prins v. Coughlin*, 76 F.3d 504, 506 (2d Cir.1996) (per curiam) ("It is settled in this Circuit that a transfer from a prison facility moots an action for injunctive relief against the transferring facility.").

not demonstrated a likelihood of future harm, and that his claim could not be redressed by a grant of injunctive relief against the former policy. Accordingly, the Court finds that Plaintiff does not have standing to seek injunctive relief under RLUIPA, and Defendants' motion for summary judgment is granted with respect to this claim.

## III.    First Amendment Claim Pursuant to 42 U.S.C. § 1983

Defendants also move for summary judgment as to Plaintiff's First Amendment free exercise claim under 42 U.S.C. § 1983, arguing that Plaintiff has failed to demonstrate a question of fact with respect to any substantial burden he sustained from the CAD form policy, and that any restrictions imposed were narrowly tailored to legitimate penological interests. (Dkt. 22-2 at 8-18). For the reasons that follow, the Court finds that summary judgment in favor of Defendants as to Plaintiff's free exercise claim under § 1983 is appropriate.

### A.    Personal Involvement

Defendants argue that summary judgment should be granted in their favor for Plaintiff's free exercise claim because the record does not sufficiently demonstrate Defendants' personal involvement in the alleged constitutional violation against Plaintiff. On the record before it, the Court finds that a reasonable trier of fact could not determine that Bradt and Thompson were personally involved in the claimed constitutional violation against Plaintiff, but could find that Latona, Conner, and McKoy were involved.

A defendant's personal involvement in an alleged constitutional deprivation is a prerequisite for liability under § 1983. *Scott v. Fischer*, 616 F.3d 100, 110 (2d Cir. 2010) ("[A] lack of alleged personal involvement or knowledge bars any claim that the [DOCCS]

defendants can be held liable for what occurred at the hearing."). Furthermore, "supervisor liability in a § 1983 action depends on a showing of some personal responsibility, and cannot rest on *respondeat superior*." *Hernandez v. Keane*, 341 F.3d 137, 144 (2d Cir. 2003). Supervisory officials may be found personally responsible for a constitutional violation in the following ways:

> (1) [A]ctual direct participation in the constitutional violation, (2) failure to remedy a wrong after being informed through a report or appeal, (3) creation of a policy or custom that sanctioned conduct amounting to a constitutional violation, or allowing such a policy or custom to continue, (4) grossly negligent supervision of subordinates who committed a violation, or (5) failure to act on information indicating that unconstitutional acts were occurring.

*Id.* at 145; *see Wright v. Smith*, 21 F.3d 496, 501 (2d Cir. 1994).

The Court finds there is no genuine issue of material fact as to whether Bradt and Thompson were personally involved in the alleged violation of Plaintiff's free exercise rights. Bradt's involvement with Plaintiff's alleged rights deprivation is limited to the referral of a grievance submitted by Plaintiff about the CAD policy to the Inmate Grievance Program Supervisor. (Dkt. 22-4 at ¶ 6). A prison official's referral of a prisoner's grievance to another party does not establish personal involvement of the prison official in an alleged constitutional violation. *See Sealey v. Giltner*, 116 F.3d 47, 51 (2d Cir. 1997) (holding that a prison official who referred letters regarding a plaintiff's appeal to a subordinate does "not demonstrate the requisite personal involvement" to make the official liable under § 1983). Consequently, no reasonable trier of fact could determine that Bradt was personally involved here.

Additionally, Thompson also was not sufficiently personally involved for § 1983 liability. Plaintiff alleges that Thompson could have voided the CAD policy but instead enforced it through Latona. (Dkt. 25 at 32). As the deputy superintendent of program services at Attica, Thompson did not create the policy—it was a state-wide policy instated by DOCCS' MFVS office and then handed down to Attica to implement. (Dkt. 22-1 at ¶ 12). As such, Thompson could not choose whether or not to put the policy in place. *See Tylena M. v. Heartshare Children's Servs.*, 390 F. Supp. 2d 296, 315 (S.D.N.Y. 2005) (holding the defendant was not personally involved because the "[p]laintiffs have not produced any evidence to show that [the defendant] either personally established the allegedly unconstitutional policies or affirmatively approved them at any time."). Moreover, Thompson delegated the implementation of the CAD form policy to Latona and had no personal interaction with Plaintiff. (Dkt. 22-7 at ¶ 5); *see Zikanda v. Cty. Of Albany*, No. 1:12-CV-1194, 2015 WL 5510956, at *26 (N.D.N.Y. Sept. 15, 2015) (dismissing the defendant from the action for lack of personal involvement because the defendant "did nothing to establish the policies that allegedly harmed [the plaintiff], and he was not aware of any mistreatment of her while she was in the Jail"). A reasonable finder of fact could not find, on the record before the Court, that Thompson "created or continued a policy or custom which allowed the violation to occur," or that he was otherwise personally involved in the alleged deprivation of Plaintiff's rights. *Reid v. Artus*, 984 F. Supp. 191, 195 (S.D.N.Y. 1997). Therefore, the Court grants summary judgment in favor of Bradt and Thompson for Plaintiff's free exercise claim.

However, the Court finds sufficient evidence tending to establish personal involvement exists as to Plaintiff's § 1983 claims against Latona, Conner, and McKoy. Officials are subject to § 1983 liability if they actually and directly participated in the alleged constitutional violation. *Hernandez*, 341 F.3d at 144. Here, Conner distributed the CAD form to Plaintiff several times (Dkt. 22-1 at ¶ 16), and Latona was not only in charge of implementing the CAD form policy at Attica, but also met Plaintiff in person to assure him that Attica did not intend to discipline people with respect to the new CAD form procedures (*id.* at ¶¶ 17, 38). A reasonable trier of fact could find that Latona and Conner actually and directly participated in the alleged violation of Plaintiff's constitutional rights by repeatedly giving him the CAD form and by meeting with him about the policy.

The Court also finds that McKoy was sufficiently personally involved in the alleged free exercise violation for Plaintiff to maintain a § 1983 claim against him. A supervisory official may be liable under § 1983 for allowing "a policy or custom that sanctioned conduct amounting to a constitutional violation . . . to continue." *Hernandez*, 341 F.3d at 144. In the matter before the Court, while McKoy did not originally implement the CAD form policy, he rescinded it several months after it was instituted. (Dkt. 22-3 at 17). McKoy's rescission of the CAD policy at the very least presents a triable issue of fact as to whether he was personally involved because he allowed the policy to continue. *See Wise v. N.Y.C. Police Dep't*, 928 F. Supp. 355, 368 (S.D.N.Y. 1996) ("A supervisory officer may be held liable for failing to intervene to stop the discriminatory conduct of other officers if the supervisor had actual or constructive knowledge of gender-discriminatory policies and that he permitted such conduct to continue." (quotation and citation omitted)).

Therefore, the Court must consider whether the conduct of Conner, Latona, or McKoy violated Plaintiff's free exercise rights.

## B. Free Exercise Clause Analysis

"Prisoners have long been understood to retain some measure of the constitutional protection afforded by the First Amendment's Free Exercise Clause." *Ford v. McGinnis*, 352 F.3d 582, 588 (2d Cir. 2003). A claim under the Free Exercise Clause, made actionable against state officials through § 1983, requires that a "prisoner must show at the threshold that the disputed conduct substantially burdens his sincerely held religious beliefs."[5] *Salahuddin v. Goord*, 467 F.3d 263, 274-75 (2d Cir. 2006). If there is a substantial burden, then the defendants "bear the relatively limited burden of identifying the legitimate penological interests that justify the impinging conduct." *Id.* at 275. "[T]he burden remains with the prisoner to show that these penological concerns were irrational." *Ford*, 352 F.3d at 595 (quotation omitted). The Court analyzes Plaintiff's free exercise claim below.

---

[5]     The Second Circuit has questioned whether a plaintiff must establish that his sincerely held religious belief was substantially burdened, but has declined to decide the issue. *See Holland v. Goord*, 758 F.3d 215, 220 (2d Cir. 2014) ("It has not been decided in this Circuit whether, to state a claim under the First Amendment's Free Exercise Clause, a prisoner must show at the threshold that the disputed conduct substantially burdens his sincerely held religious beliefs." (quotation omitted)); *see also Barnes v. Furman*, No. 14-581, 2015 WL 6216534, at *3 n.3 (2d Cir. Oct. 22, 2015) ("We have not decided whether the substantial burden test remains viable in our Circuit following *Employment Division v. Smith*, 494 U.S. 872 (1990). . . ."). Because the issue has not yet been squarely addressed by the Second Circuit, this Court will continue to apply the substantial burden test. *See Hamilton v. Countant*, No. 13-CV-669(RA), 2016 WL 881126, at *3 (S.D.N.Y. Mar. 1, 2016); *Smith v. Artus*, No. 9:07-CV-1150NAM/ATB, 2015 WL 9413128, at *9 (N.D.N.Y. Dec. 22, 2015).

### 1.  **Sincerely Held Belief**

The Court finds that a reasonable trier of fact could determine Plaintiff's religious belief was sincerely held.  The Second Circuit Court of Appeals has explained:

> Our founding principles require that courts resist the dangerous temptation to try to judge the significance of particular devotional obligations to an observant practitioner of faith.  For, it is not within the judicial ken to question the centrality of particular beliefs or practices to a faith, or the validity of particular litigants' interpretations of these creeds.

*McEachin v. McGuinnis*, 357 F.3d 197, 201 (2d Cir. 2004) (quotation omitted).  Rather, a court should consider whether the plaintiff has "demonstrate[d] that the beliefs professed are sincerely held and in the individual's own scheme of things, religious." *Ford*, 352 F.3d at 595 (quotation omitted).

Defendants acknowledge that Plaintiff followed NOI at the time the CAD policy was implemented.  (Dkt. 22-1 at ¶ 5).  Defendants do not address, and therefore do not contest, that Plaintiff's dietary restrictions for Saviors' Day were part of a sincerely held religious belief.  Additionally, Conner, a chaplain for NOI, administered the CAD consent form to Plaintiff so he could participate in the Saviors' Day feast, which demonstrates that the dietary restriction is indeed part of the religion. (Dkt. 22-1 at ¶ 16).  Viewing the record in the light most favorable to Plaintiff, a reasonable finder of fact could determine that Plaintiff sincerely believed consuming a CAD meal on Saviors' Day was a religious act.

### 2.  **Substantial Burden**

A reasonable trier of fact could also find Plaintiff has established that he sustained a substantial burden on his religious beliefs.  While the requirement to sign a form is no more than a *de minimus* burden, genuine issues of material fact exist as to whether requiring

mandatory attendance at religious meals under threat of discipline constitutes a substantial burden on Plaintiff's rights.

"[A] substantial burden exists where the state put[s] substantial pressure on an adherent to modify his behavior and to violate his beliefs." *Jolly v. Coughlin*, 76 F.3d 468, 477 (2d Cir. 1996) (quotation omitted) (alteration in original). "Undeniably, the reach of the First Amendment's free exercise clause extends beyond mere attendance at congregate religious services into other aspects of prison life, including, pertinently, that of an inmate's diet and participation in religious meals." *Johnson v. Guiffere*, No. 9:04-CV-57, 2007 WL 3046703, at *4 (N.D.N.Y. Oct. 17, 2007). "[C]ourts have generally found that to deny prison inmates the provision of food that satisfies the dictates of their faith does unconstitutionally burden their free exercise rights." *McEachin*, 357 F.3d at 594, 203; *see Holland*, 758 F.3d at 221-22 (holding that ordering an inmate practicing Ramadan to drink water for a urine sample during fast substantially burdened his free exercise rights); *Torres v. Aramark Food and Commissary Servs. of the Orange Cty. Corr. Facility*, No. 14-CV-7498 (KMK), 2015 WL 9077472, at *9-10 (S.D.N.Y. Dec. 16, 2015) (finding the plaintiff's allegations that he was forced to choose between eating nutritionally adequate meals and complying with his religious fasting requirements during Ramadan stated more than a *de minimis* violation).

Courts within this circuit have held that "denial of a single religious meal can violate an inmate's constitutional rights if it occurs on a significant religious holiday." *Shepherd v. Fisher*, No. 08-CV-9297 (RA), 2017 WL 666213, at *34 (S.D.N.Y. Feb. 16, 2017); *see McGinnis*, 352 F.3d at 593-94 (holding an inmate's free exercise rights were substantially

- 16 -

burdened when prison officials denied his request for a meal to celebrate a holiday with great religious significance of which the feast is an integral part). However, an impingement on an inmate's diet during religious holidays is often found to constitute no more than a *de minimis* burden on the inmate's free exercise rights. *See Hamilton v. Countant*, No. 13-CV-669(RA), 2016 WL 881126, at *7 (S.D.N.Y. Mar. 1, 2016) ("Although the inability to take communion with cornbread and grape juice may have altered Plaintiff's normal [religious] practice, it did not constitute a *substantial* burden because communion makes up only one aspect of the day-long [religious] celebration."); *see also Washington v. Afify*, 968 F. Supp. 2d 532, 537-38 (W.D.N.Y. 2013) (denial of three consecutive Ramadan meals, including two breakfasts and one evening meal, does not violate the First Amendment); *Jean-Laurent v. Los*, No. 12-CV-132S (F), 2015 WL 1015383, at *6-7 (W.D.N.Y. Mar. 9, 2015) ("[M]issing two of the Ramadan meals . . . does not constitute a violation of Plaintiff's First Amendment right to the free exercise of his religion"). Courts in the Second Circuit also recognize that in the free exercise context, "[p]rison authorities have reasonable discretion in selecting the means by which prisoners' rights are effectuated." *Kahane v. Carlson*, 527 F.2d 492, 496 (2d Cir. 1975); *see Majid v. Wilhelm*, 110 F. Supp. 2d 251, 254, 258 (S.D.N.Y. 2000) (finding genuine issues of material fact as to whether the defendant's refusal to separate non-halal meats on the plaintiff's food tray constituted a reasonable exercise of the defendant's discretion).

It is true that under relevant case law, requiring Plaintiff to sign a form before receiving CAD meals would not, standing alone, constitute a substantial burden. Courts in the Second Circuit have found that signing a form prior to receiving religious meals is at

most a *de minimus* burden. *Afify*, 968 F. Supp. 2d at 537-38 (holding the plaintiff's allegation that he was denied religious meals "because of his refusal to sign a form indicating his assent to work in the mess hall" was insufficient to state a free exercise claim); *see Cole v. Artuz*, No. 93 Civ. 5981(WHP) JCF, 1999 WL 983876, at * 3 (S.D.N.Y. Oct. 28, 1999) (holding that requiring "inmates in keeplock to present written approval to the prison gate officer before being released to attend religious services" both accommodates inmates' religious needs and prison security requirements). Plaintiff was not categorically denied access to a religious meal after requesting one. *See Ford*, 352 F.3d at 586 (holding an inmate's free exercise rights were substantially burdened when prison officials denied his request for a meal to celebrate a religious holiday). To the contrary, Attica made CAD meals for the Saviors' Day celebration available to NOI inmates who signed the CAD form, and Plaintiff was given several opportunities to sign the form and did not utilize any of them. (Dkt. 22-1 at ¶¶ 8, 16, 18).

However, the portion of the policy that imposed punishment for voluntarily missing a religious meal could be a substantial burden. The potential for disciplinary action in the CAD policy "perfectly illustrates the 'unique area of tension between the establishment clause and the free exercise clause of the First Amendment' that is presented by the prison context." *Lewis v. Zon*, 920 F. Supp. 2d 379, 386 (W.D.N.Y. 2013) (quoting *United States v. Kahane*, 396 F. Supp. 687, 698 (E.D.N.Y. 1975), *modified by Kahane v. Carlson*, 527 F.2d 492 (2d Cir. 1975)). Requiring inmates with special religious dietary needs "to accept mandatory attendance at meals or face disciplinary sanctions in order to follow a [religious] diet, arguably constitutes a substantial burden on the inmates' right to religious exercise."

*Guillory v. Morris*, No. 9:13-CV-00378 (NAM/TWD), 2014 WL 4637224, at *3, *9 (N.D.N.Y. May 28, 2014) (finding that the defendants' policy of imposing disciplinary sanctions after the plaintiff missed one religious meal could be a substantial burden on the plaintiff's free exercise rights), *accepted on this ground by Guillory v. Morris*, No. 9:13-CV-378 (NAM/TWD), 2014 WL 4637229, at *1 (N.D.N.Y. Sept. 16, 2014). Plaintiff contends that the reason he did not fill out the CAD form to receive a religious meal for Saviors' Day was because he feared potentially facing punishment if he missed the meal. (Dkt. 25 at 26-27). While Latona verbally reassured Plaintiff that Attica did not *intend* to discipline him if he missed the Saviors' Day meal (Dkt. 22-1 at ¶ 38; Dkt. 25 at 26-27), this statement was not an assurance that Attica would under no circumstances do so, and Latona refused to memorialize that promise in writing. Looking at the evidence in the light most favorable to Plaintiff, there are genuine issues of material fact as to whether the threat of punishment included in the CAD policy was a substantial burden on Plaintiff's free exercise right. Therefore, the Court must determine whether the policy is connected to legitimate penological interests.

### 3.  **Legitimate Penological Interests**

Defendants maintain that a reasonable trier of fact would necessarily conclude that the CAD policy was reasonably related to DOCCS' legitimate penological interests. (Dkt. 22-2 at 14-19). The Court agrees, and accordingly grants Defendants' summary judgment motion as to Plaintiff's free exercise claim.

"Under the First Amendment . . . a generally applicable policy will not be held to violate a plaintiff's right to free exercise of religion if that policy is reasonably related to

legitimate penological interests." *Redd v. Wright*, 597 F.3d 532, 536 (2d Cir. 2010) (quotation omitted). "In determining whether the burden imposed by the defendants is reasonable or irrational, a court evaluates four factors: (1) whether the action had a valid, rational connection to a legitimate governmental objective; (2) whether the prisoner has an alternative means of exercising the burdened right; (3) the impact on guards, inmates, and prison resources of accommodating the right; and (4) the existence of alternative means of facilitating the plaintiff's exercise of the right that have only a *de minimis* adverse effect on valid penological interests." *Zon*, 920 F. Supp. 2d at 384 (quotation omitted); *see Turner v. Safley*, 482 U.S. 78, 89-90 (1987) (discussing the above four factors and their relevance to determining the reasonableness of a prison regulation that impinges on inmates' constitutional rights).[6] In applying these factors, the Court must afford "deference to the prison administrator." *Forde v. Zickefoose*, 612 F. Supp. 2d 171, 180 (D. Conn. 2009).

Here, Defendants have satisfied their "relatively limited burden of identifying the legitimate penological interests that justify the impinging conduct." *Salahuddin*, 467 F.3d at 275. Courts in this circuit recognize that limits on religious dietary requests are reasonably related to the goal of avoiding excessive administrative costs. *See Benjamin v. Coughlin*, 905 F.2d 571, 579 (2d Cir. 1990) ("Courts . . . are reluctant to grant dietary requests where the cost is prohibitive. . . ."); *Carlson*, 527 F.2d at 496 (holding that "[p]rison authorities have reasonable discretion in selecting the means by which prisoners'

---

[6]     The first *Turner* "factor" is more properly labeled an "element" because it is not simply a consideration to be weighed but rather an essential requirement. *Salahuddin*, 467 F.3d at 274.

[free exercise] rights are effectuated" because "[s]uch details are best left to the prison's management which can provide from the food supplies available within budgetary limitations"); *Hamilton v Smith*, No. 9:06-CV-0805 (GTS/DRH), 2009 WL 3199520, at *5 (N.D.N.Y. Sept. 30, 2009) ("[A] rational nexus exists between a prison's dietary policies and its legitimate administrative and budgetary concerns." (quotation and citation omitted)). In the matter before the Court, DOCCS implemented the CAD form policy in an effort to give New York state prisons a cost-efficient way to know how many CAD meals to prepare so that everyone who wanted to participate in religious meals could do so. (Dkt. 22-3 at ¶¶ 36-37). Additionally, the disciplinary part of the policy in particular was designed to ensure that prison resources were not wasted. (Dkt. 22-2 at 18). Therefore, the disciplinary portion of the CAD form policy was rationally related to the penological interests of avoiding excessive administrative costs and budgetary concerns.

It is unclear whether Plaintiff had alternative means of exercising his religious beliefs. The Supreme Court has held that "alternative means" in the free exercise context is defined as "whether the inmates were deprived of all means of expression," not just the religious practice at issue. *O'Lone v. Estate of Shabazz*, 482 U.S. 342, 352 (1987); *see Ward v. Rabideau*, 732 F. Supp. 2d 162, 167-68 (W.D.N.Y. 2010) (stating that if other avenues are available for exercising an asserted right, "courts should be particularly conscious of the 'measure of judicial deference owed to corrections officials . . . in gauging the validity of the regulation'" (quoting *Pell v. Procunier*, 417 U.S. 817, 827 (1974)). Here, it is not clear whether Plaintiff could have properly celebrated Saviors' Day without a CAD meal because the record does not indicate how integral the feast was to the Saviors' Day

celebration. *See Withrow v. Bartlett*, 15 F. Supp. 2d 292, 296 (W.D.N.Y. 2006) (holding the plaintiff had an alternative means of exercising his free exercise right because the Islamic affairs specialist employed by DOCCS stated in an affidavit that the plaintiff could have met the five daily prayer requirements without praying in the recreational yard with other Muslims); *Lee v. Wenderlich*, No. 05-CV-6077, 2006 WL 2711671, at *7 (W.D.N.Y. Sept. 21, 2006) (finding defendants did not present evidence that the plaintiff had an alternative way to celebrate the holiday of Ramadan, and that presenting evidence that the plaintiff could still practice Islam was not sufficient). Without having further evidence before it about the intricacies of the Saviors' Day celebration, the Court cannot say definitively one way or the other whether Plaintiff had alternative means of exercising his religious beliefs in this instance. As this factor under *Turner* is only a consideration to be weighed by the Court and is not an essential element, *Salahuddin*, 467 F.3d at 274, and in light of the lack of evidence presented by either party on the matter, the Court does not accord much weight to this prong of the analysis.

The Court finds that accommodating Plaintiff's free exercise right would have had an impact on other inmates, prison personnel, and the allocation of prison resources generally. "When accommodation of an asserted right will have a significant 'ripple effect' on fellow inmates or on prison staff, courts should be particularly deferential to the informed discretion of corrections officials." *Turner*, 482 U.S. at 90. Here, if the CAD form policy did not impose potential disciplinary proceedings, the incentive for prisoners to comply with the policy would have been eliminated. Therefore, if the CAD policy accommodated Plaintiff's right by not imposing potential discipline, it could have rippled

out and caused the very impact on prison resources that the policy sought to avoid. *See Wenderlich*, 2006 WL 2711671, at *6 ("Rules designed to enforce the conservation of administrative and financial resources have been recognized by courts as a legitimate penological interest.").

Finally, no "alternative means of facilitating [P]laintiff's exercise of the right that have only a *de minimis* adverse effect on valid penological interests" have been presented to the Court. DOCCS instituted the CAD policy due to significant budgetary concerns. (Dkt. 22-3 at ¶ 41). The cost of a CAD meal is more than twice the amount of a standard one (*id.* at ¶ 9), and for this reason courts within this circuit have found that imposing a mandatory attendance policy for prisoners who request religious meals is reasonably related to the prison's "legitimate penological interest in managing its [food] budget," *Davidson v. Murray*, No. 92-CV-0283C, 2005 WL 1123756, at *4 (W.D.N.Y. May 10, 2005). Consistent and uniform implementation of "dietary plans, where they have been opted into by inmates, is the best and narrowest means of accomplishing" the dual goals of "ensuring adequately-planned, organized and orderly food service within the prison" and "preserving the inmates' First Amendment free exercise freedoms," while at the same time "making the most efficient use of prison resources." *Zon*, 920 F. Supp. 2d at 387. Such is the case with the CAD form policy implemented by DOCCS at issue here.

After considering the factors laid out in *Turner*, the Court finds that even though a genuine issue of material fact exists as to whether the CAD form policy was a substantial burden on Plaintiff's free exercise rights, a rational trier of fact could only find that the CAD form policy was reasonably related to DOCCS' legitimate penological interest in

avoiding excessive administrative costs, and no reasonable jury would conclude that those penological concerns were irrational. Accordingly, Defendants' motion for summary judgment as to Plaintiff's free exercise claim is granted.[7]

## CONCLUSION

For the reasons set forth above, Defendants' motion for summary judgment (Dkt. 22) is granted, and the Clerk of the Court is directed to enter judgment in favor of Defendants and close this case.

SO ORDERED.

ELIZABETH A. WOLFORD
United States District Judge

Dated: December 27, 2018
      Rochester, New York

---

[7]     Defendants also contend that they are entitled to qualified immunity with respect to all of Plaintiff's claims. (*See* Dkt. 22 at 20-23). Because the Court holds a reasonable trier of fact would find Plaintiff did not produce enough evidence to demonstrate that Defendants violated his constitutional rights, the Court does not reach this issue.